**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION**

| | |
|---|---|
| **Terry Gorham,** ) | |
| ) | |
| **Claimant** ) | |
| ) | |
| **v.** ) | **CIVIL ACTION NO.** |
| ) | **5:14-CV-266-KOB** |
| ) | |
| **CAROLYN W. COLVIN,** ) | |
| **ACTING COMMISSIONER** ) | |
| **OF SOCIAL SECURITY,** ) | |
| ) | |
| ) | |
| **Respondent** ) | |
| ) | |

**<u>MEMORANDUM OPINION</u>**

**I. INTRODUCTION**

The claimant, Terry Dale Gorham, filed a Title II application for a period of disability and disability insurance benefits on February 17, 2012, alleging disability beginning June 30, 2009. The claimant alleges disability resulting from problems with his back, shoulder, and knees; arthritis pain; degenerative disc disease; Major Depression; and anxiety. (R. 22, 165). The Commissioner denied the claim initially on April 17, 2012. The claimant requested a hearing on June 14, 2012, and the Administrative Law Judge conducted a video hearing on February 28, 2013. On February 29, 2013, and again on March 5, 2013, the claimant's attorney submitted written statements indicating the claimant amended his alleged onset date to July 22, 2011. (R. 20).

1

On May 15, 2013, the ALJ determined that the claimant was not disabled as defined by the Social Security Act and, thus, not eligible for supplemental security income. (R. 34). On December 13, 2012, the Appeals Council denied the claimant's request for review; consequently, the ALJ's decision became the final decision of the Commissioner of the Social Security Administration. (R. 1). The claimant has exhausted his administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. § § 405 (g) and 1383(c)(3). For the reasons stated below, this court affirms the decision of the Commissioner.

## II. ISSUES PRESENTED

The claimant presents the following issues for review: 1) whether the ALJ properly discredited the opinion of the treating physician, Dr. Ismail; and 2) whether substantial evidence in the record supports the ALJ's RFC assessment.

## III. STANDARD OF REVIEW

The standard for reviewing the ALJ's decision is limited.  This court must affirm the ALJ's decision if the ALJ applied the correct legal standards and if the factual conclusions are supported by substantial evidence.  *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No...presumption of validity attaches to the [ALJ's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999.  This court does not review the ALJ's factual determinations *de novo*. The court will affirm those factual determinations that are supported by substantial evidence.  "Substantial evidence" is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 402 (1971).

2

The court must keep in mind that opinions, such as whether a claimant is disabled, the nature and extent of a claimant's Residual Functional Capacity, and the application of vocational factors, "are not medical opinions, . . . but are, instead, opinions on issues reserved to the ALJ because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(e), 416.927(d). Whether the claimant meets the listing and is qualified for Social Security disability benefits is a question reserved for the ALJ, and the court "may not decide facts anew, re-weigh the evidence, or substitute [its] judgment for that of the ALJ." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). Thus, even if the court were to disagree with the ALJ about the significance of certain facts, the court has no power to reverse that finding as long as substantial evidence in the record supports it.

The court must "scrutinize the record in its entirety to determine the reasonableness of the [ALJ]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not look only to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to result in death or which has lasted or can be expected to last for a continuous

3

period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  To make this determination, the

Commissioner employs a five-step, sequential evaluation process:

> (1) Is the person presently unemployed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific impairments set          forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
> (4) Is the person unable to perform his or her former occupation?
> (5) Is the person unable to perform any other work within the economy?
>
> An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability.  A negative answer to any question, other than step three, leads to a determination of "not disabled.

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986); 20 C.F.R. §§ 404.1520, 416.920.

Absent a good showing of cause to the contrary, the ALJ must accord substantial or

considerable weight to the opinions of treating physicians. *Lamb v. Bowen*, 847 F.2d 698, 703

(11th Cir. 1988). The ALJ must credit the opinions of treating physicians over those of

consulting physicians unless good cause exists for treating the opinions differently. *Lewis v.*

*Callahan*, 125 F.3d 1436, 1440-41 (11th Cir. 1997). The ALJ may discount a treating physician's

report when it is not accompanied by objective medical evidence or is wholly conclusory.

*Crawford v. Commissioner*, 363 F.3d at 1159. Where the ALJ articulated specific reasons for

failing to give the opinion of a treating physician controlling weight and those reasons are

supported by substantial evidence, the ALJ commits no reversible error. *Moore v. Barnhart,* 405

F.3d 1208, 1212 (11th Cir. 2005).

The ALJ must complete an RFC assessment of each claimant.  Social Security Ruling

96–8p provides regarding RFC assessment:

> The RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b), (c), and (d) of 20 CFR 404.1545 and 416.945. Only after that may RFC be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy.

SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996).  The ALJ must first assess the claimant's functional limitations and restrictions and then express his functional limitations in terms of exertional levels. *See Castel v. Comm'r of Soc. Sec.,* 355 F. App'x 260, 263 (11th Cir.2009); *Freeman v. Barnhart,* 220 F. App'x 957, 959–60 (11th Cir.2007); *see also Bailey v. Astrue,* 5:11–CV–3583–LSC, 2013 WL 531075 (N.D.Ala. Feb. 11, 2013).

The ALJ must consider all of the relevant evidence in assessing the claimant's functional limitations, including

> medical history, medical signs and laboratory findings, the effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine, side effects of medication), reports of daily activities, lay evidence, recorded observations, medical source statements, effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment, evidence from attempts to work, need for a structured living environment, and work evaluations, if available.

SSR 96–8p at *4–*5.

"'Sedentary work' involves lifting no more than ten pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a), [20 C.F.R. §

416.967(a)].  Social Security Ruling 83-10 elaborates on the definition of sedentary by providing that "'[o]ccasionally means occurring from very little up to one-third of the time," and that "periods of standing or walking should generally total no more than about two hours of an eight hour workday, and sitting should generally total approximately six hours of an eight hour workday." *Kelly v. Apfel*, 185 F.3d 1121, 1213 n.2 (11th Cir. 1999).

"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, [a claimant] must have the ability to do substantially all of these activities. If someone can do light work, [the Commissioner determines] that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567(b), [20 C.F.R. §416.967(b)]; see also *Walker v. Bowen*, 826 F.2d 996, 1000 (11th Cir. 1987).

If the claimant's work level falls somewhere in the middle of a higher work level that calls for a finding of not disabled and a lower work level that calls for a finding of disabled, then the assistance of a vocational expert to determine that impact of the claimant's impairment upon his ability to work is acceptable. S.S.R. 83-12.

## V. FACTS

The claimant is a high school graduate and was forty-nine years old at the time of the hearing.  (R. 166). He alleges his disability started on July 22, 2011. (R. 20). The claimant last

worked in the textile industry as a dye machine operator/weigher from October 1999 until July 2009. Prior to this, he printed t-shirts at a screen shop. (R. 166).

*Physical Limitations*

In 2011, the claimant visited the Pain and Wound Center of Gadsden, Alabama on thirteen occasions: January 4, February 9, March 2, March 30, May 11, June 8, June 29, July 27, August 31, September 21, October 31, November 28, and December 21.  At each visit, he complained of a constant ache in an unspecified area of his body rated anywhere from a four to seven on a scale of ten. On each occasion, the claimant also complained that the pain affected his ability to sleep, his mood, and his physical activity, but not his appetite or concentration; he participated in a straight leg raise test, sciatic stretch test, and Patrick's test with negative results; his cervical range of motion was mildly decreased; and his lumbar range of motion was moderately decreased. On December 21, he complained of numbness in his right arm. Odeane Connor, M.D., conducted each examination, and on each occasion, she prescribed the claimant Lunesta, Celebrex, Valium, Soma, Fentanyl Patch, Prevacid, and Cymbalta. Dr. Connor diagnosed the claimant with a right rotator cuff tear and repair, impingement, and tendinitis. Unfortunately, the court is unable to determine the rest of Dr. Connor's diagnosis because the notes are illegible. (R. 232-56).

On January 25 and February 6 of 2012, the claimant returned to the Pain and Wound Center. The claimant reported the same type and amount of pain as before, and again complained of numbness in his right arm. Dr. Connor appears to have made the same diagnosis and treatment plan for the claimant, however, portions of this assessment and diagnosis are, again, illegible. (R. 228-31).

In 2012, the claimant also visited the Scottsboro Quick Care Clinic on multiple occasions. On April 10, Younus M. Ismail, M.D., a general practioner at Scottsboro Quick Care Clinic, conducted a medical examination for a disability physical examination.  Dr. Ismail noted that the claimant was an average, overweight male, alert, awake, talkative, constantly complaining of pain and asking for pain medications during the examination. Dr. Ismail also noted that the claimant could move from the chair to the examination table without any difficulty, and that he was not using any assistive device. Dr. Ismail indicated that the claimant said that he had some pain when moving his shoulder, but was not willing to raise his extremities above his shoulder. Dr. Ismail noted that the claimant had a normal range of motion in all of his extremities; complained of pain in his mid and lower back; and showed a reduced range of motion in his spine. However, Dr. Ismail noted that he was unable to determine an exact range of motion because the claimant would not relax his muscles and provided resistance when the doctor tried to determine his range of motion.

Dr. Ismail concluded his report by diagnosing the claimant with chronic back pain, degenerative disc disease of the spine, osteoarthritis, depression, and anxiety. He also commented that the claimant had "some pain" in his back and "some limitations" in his shoulder movements. Dr. Ismail noted that the claimant asked for prescription pain medication during the examination. Dr. Ismail suggested that a further evaluation, as well as occupational and physical rehabilitation, would be beneficial for the claimant. (R. 261-262).

On August 6, September 9, and October 3, the claimant returned to the Clinic for follow-up appointments with Dr. Ismail. Dr. Ismail reported that, on each of these occasions, the claimant denied having any pain and was not receiving medical attention or taking any

8

medication for pain control at this time. (R. 280-85).

On March 3, 2013, upon request of the claimant's attorney, Dr. Ismail completed a

Physical Capacities Evaluation Form.  He noted that the claimant could lift ten pounds

occasionally or less frequently; sit up to six hours a day and walk one hour a day; could never

perform pulling and pushing movements or stooping; and could occasionally perform climbing

and balancing, gross manipulation (grasping, twisting, and handling), fine manipulation, bending,

and reaching. Additionally, Dr. Ismail indicated that the claimant could not operate motor

vehicles or work around machinery. (R. 340).

On the same day, in response to a request by the claimant's attorneys, Dr. Ismail

completed a Clinical Assessment of Pain. He reported that "pain is present to such an extent as to

be distracting to adequate performance of daily activities of work"; that physical activity such as

prolonged sitting, walking, standing, bending, stooping, or moving of extremities, "will greatly

increase [the claimant's pain] and to such a degree as to cause distraction from tasks or total

abandonment of tasks"; and that the patient had an underlying medical condition consistent with

the pain he was experiencing. (R. 341-42).

*Mental Limitations*

On July 6, 2012, the claimant was arrested and taken to the Huntsville Hospital after

making threats to himself and his family; he was diagnosed with personality disorder and drug

abuse and released the next day. On July 12, 2012, after a suicide attempt, the claimant was

diagnosed with Major Depressive Disorder. The claimant received treatment for Major

Depressive disorder on several occasion from July 12, 2012 through October 15, 2012. On

October 15, 2012, the claimant was admitted to Mountain View Treatment Center for Major

Depression. He was discharged on October 22, 2012, after he reported that he was feeling better and was no longer having suicidal thoughts. (R. 286-294).

The claimant completed a Function Report on February 28, 2012. The claimant reported that he watched TV, did housework, and cooked. He reported that he was able to care for himself, do laundry and yard work, care for his dog, vacuum, pay bills, count change, handle a savings account, use a checkbook/money orders, go to the grocery store, and drive. The claimant reported that he did not need a reminder or assistance to complete any of these tasks. (R. 187-202).

On March 3, 2013, at the request of the claimant's lawyers, Dr. Ismail completed a supplemental questionnaire in which he reported that the claimant had moderate restrictions of activities of daily living; moderate degree of difficulty in maintaining social functioning; moderate estimated deficiencies of concentration, persistence, or pace resulting in frequent failure to complete tasks in a timely manner; marked estimated impairment of ability to respond to customary work pressures; moderate ability to understand, carry out, and remember instructions in a work setting (on a sustained basis in a routine work setting); moderate ability to respond appropriately to supervision in a work setting (on a sustained basis in a routine work setting); moderate ability to respond appropriately to co-workers in a work setting (on a sustained basis in a routine work setting); moderate ability to perform simple tasks in a work setting (on a sustained basis in a routine work setting); and moderate ability to perform repetitive tasks in a work setting (on a sustained basis in a routine work setting). Dr. Ismail wrote that these limitations could be expected to last longer than twelve months. Finally, Dr. Ismail noted that he

had not obtained a psychological evaluation, and that the patient needed a psychological evaluation. (R. 339).

## VI. ALJ HEARING

After the Commissioner denied the claimant's request for supplemental security income, the claimant requested and received a hearing before an ALJ on February 28, 2013. The ALJ started the hearing by inquiring about the claimant's use of pain medication. In response to the ALJ's questions, the claimant admitted that he took more than his prescribed dosage at times, but asserted that he only took larger doses in response to continued pain and his perceived tolerance to the medication. The claimant also testified that he and his wife had separated because of his use of pain medications; however, they had not yet divorced. He then testified that he no longer took pain medications because he would rather suffer through the pain than take the medication again. Additionally, claimant testified that he no longer visited the doctor who prescribed the medication for his shoulder, because the doctor put him on the medications that "ruined [his] life." (R. 43-45).

The ALJ then questioned the claimant as to why he never took advantage of the vocational rehabilitation that he was entitled to as part of a his worker's compensation settlement. In response, the claimant testified that he did not try vocational therapy because he felt that he was incapable of holding down a job because of his pain and mental state. When asked why his physical examination conducted at GrandView in October of 2012 indicated the claimant's movement and capabilities were normal, the claimant responded that he did not remember the physicians at GrandView conducting a physical examination. (R. 45-46).

11

Next, the claimant testified about his daily activities. He testified that he lived by himself, did his own laundry, and cooks his meals daily mostly via microwave. He also testified that he could keep track of his bills, but that his daughters helped him pay for his food and utility bills. The claimant stated that most days he would "mainly just sit and watch TV and try to deal with [his] pain and depression." (R. 46-48).

The claimant's attorney then questioned the claimant. The claimant testified that he was still depressed because his wife had left him, he was not able to work, he did not have a job, and he was in constant pain. In response to his attorney's questions about his physical abilities, the claimant said that he was able to lift a gallon of tea from the refrigerator, but that it caused him pain, and that he would have trouble lifting anything heavier than a gallon. He testified that he was able to sit for thirty to forty minutes at a time and could "mosey" around for about thirty minutes or walk about a city block at a normal pace before having to sit down. He then said that his pain forced him to lie down for two-and-a-half to three hours in an eight hour period. (R. 51-53).

Finally, the vocational expert, Jewel E.B. Euto, Ph. D., testified about the claimant's ability to retain a job. Dr. Euto noted that the claimant was a fifty-one-year-old man with a twelfth grade education and past relevant work experience as a dye machine operator. The ALJ then posed four hypothetical situations. (R. 54).

In the first hypothetical, the ALJ assumed a claimant, Mr. Alpha, with the actual claimant's same education, training, and work experience. The hypothetical claimant was limited to a maximum of light range of work as that term is defined under the regulations, and was further limited to frequent postural maneuvers except no climbing of ropes, ladders or scaffolds;

12

only occasional overhead reaching of the left upper extremity; had to avoid concentrated hot or cold temperature extremes, extreme wetness, humidity or vibrations; and avoid dangerous moving, unguarded, machinery, heights and large bodies of water. The ALJ then asked whether the claimant was able to perform any of his past relevant work.  Dr. Euto responded that he was not. When asked if any other jobs existed in the national or regional economies that Mr. Alpha could perform, Dr. Euto testified that Mr. Alpha could find work as an information clerk with 12,100 positions in Alabama and 937,000 nationally; a bench assembler, with 2,300 positions in Alabama and 235,900 nationally; or an egg breaker (a person who holds tools and assists assembly line workers) with 16,300 positions in Alabama and 420,000 nationally. (R. 55-56).

The ALJ then proposed a second hypothetical in which the hypothetical claimant, Mr. Beta, had the same limitations as Mr. Alpha, except that Mr. Beta had to have the option to sit or stand during the workday one or two minutes every hour or so. When asked if the claimant could find jobs in the regional or national economy with these limitations, Dr. Euto responded that the claimant could find work in the three positions previously discussed; however, the available jobs in these positions was decreased by about 25% because of the additional limitations. (R. 56).

In a third hypothetical, the ALJ asked Dr. Euto to assume a claimant, Mr. Charlie, who was identical to Mr. Beta, except that he was limited to unskilled work where he could understand, remember, and carry out simple instructions and tasks; have casual, non-intensive interactions with co-workers and the general public; have infrequent and well-explained workplace changes; and was able to concentrate and remain on tasks for two hours at a time sufficient to complete an eight-hour workday.  When asked if the claimant could find any jobs in the regional or national economy under these limitations, Dr. Euto testified that the previously

13

mentioned jobs as a bench assembler and an egg breaker would remain, but reduced by 25%, and

that the job as an information clerk would change to a small parts assembler, light with 2,250

jobs in Alabama and 235,000 nationally. (R. 56-57).

Finally, in a fourth hypothetical, the ALJ assumed another hypothetical claimant, Mr.

Delta, who had the same limitations as Mr. Charlie, except that he was expected to consistently

miss work on two or more days per month.  When asked if Mr. Delta could perform any work in

the regional or national economy, Dr. Euto testified that he could not because the excessive

absenteeism would preclude all work activity.

The claimant's attorney concluded the hearing by asking Dr. Euto if any of the previous

hypothetical claimants could find jobs in the regional or national economy if his pain caused him

to lie down two-and-a-half hours a day at times and places he could not predict in advance. Dr.

Euto testified that none of the hypothetical claimants could find work with that limitation. (R. 57-

58).

VII. ALJ OPINION

On May 15, 2013, the ALJ issued a decision finding that the claimant was not disabled

under the Social Security Act. (R. 34). First, the ALJ found that the claimant met the insured

status requirements of the Social Security Act through December 31, 2014. Next, she found that

the claimant had not engaged in substantial gainful activity since June 22, 2011, the alleged onset

of his disability. (R. 22). The ALJ then found that the claimant's degenerative disc disease, Major

Depression, and anxiety qualified as a severe impairment. The ALJ concluded, however, that the

claimant did not have an impairment or combination of impairments that met or medically

equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix

Specifically, the ALJ found that the severity of the claimant's mental impairment did not satisfy the criteria of "paragraph B," which requires at least two of the following: marked restrictions of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. (R. 26-27).

In activities of daily living, the ALJ found the claimant had mild restrictions, and she cited the fact that the claimant lived by himself, had no problems with his personal care; took care of his pet; prepared his own meals on a daily basis; and performed household chores such as laundry and vacuuming. The ALJ found the claimant to have moderate difficulties in social functioning, citing the claimant's tendency towards suicidal and homicidal ideations as well as the claimant's stressful family issues and conflicts. The ALJ found the claimant to have mild difficulties regarding concentration, persistence, or pace and supported her findings by citing the claimant's ability to pay bills, count change, handle a savings account, use a checkbook/money orders, drive a car, go out alone, shop in stores for food and other household items, read, and watch TV. The ALJ also noted that the claimant did not need a reminder or help to run errands. Finally, the ALJ found that the claimant had not experienced any extended episodes of decompensation. (R. 27).

The ALJ found that the claimant did not meet "paragraph C" requirements because the record does not show a medically documented history of decompensation; an inability to adjust to an increase in mental demands; or an inability to function outside of a highly supportive living arrangement.  (R. 27-28).

Next, the ALJ determined the claimant's Residual Functioning Capacity (RFC). She found that the claimant could perform less than the full range of light work as defined in 20 C.F.R. § 404.1567(b) with the following limitations: can frequently balance, stoop, kneel, crouch, crawl, and climb ramps and stairs; can never climb ropes, ladders, or scaffolds, and must have an option to sit and/or stand during the workday for one to two minutes every hour or so; can occasionally perform overhead reaching with his left upper extremity; should avoid concentrated hot and cold temperature extremes, extreme wetness, humidity, and vibration; should avoid being around dangerous, moving, unguarded machinery, unprotected heights, and large bodies of water; can tolerate jobs that involve infrequent and well-explained workplace changes; must have casual and non-intensive interaction with co-workers and the general public; and can concentrate and remain on tasks for two hours at a time, sufficient to complete an eight-hour workday. The ALJ came to this decision after she examined the entire record and determined that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms [were] not entirely credible." (R. 28-29).

To support her conclusion about the claimant's credibility, the ALJ first found that, although the claimant has received various treatments, he received only conservative treatment and the treatment successfully controlled his symptoms. She noted that visits to the Pain & Wound Care Center demonstrated the claimant had pain at only a five to six on a scale of ten and that physical exams revealed mildly decreased cervical and lumbar range of motion, with all other tests showing normal results. The ALJ noted that the claimant refused to do any heel-toe walking and squatting and offered voluntary rigidity during the examination. She also noted that

16

the claimant asked for prescription pain medication during the examination. The ALJ mentioned that the claimant denied having any complaints of pain at routine visits on August 6, 2012 and October 3, 2012. The ALJ also noted that the claimant denied having any pain when he was admitted to Dekalb Medical Center on October 15, 2012. (R. 29-31).

The ALJ found that while the claimant's depression and anxiety symptoms appeared to be genuine, the claimant had received conservative treatment, and that the treatment had successfully controlled his symptoms. The ALJ noted a visit to the Mountainview Treatment Center in which the claimant's concentration was normal, his recent, remote, and immediate memory was intact, and his intellectual functioning was probably in the average range.

The ALJ then found that the claimant's alleged limitations on his daily activities could not be "verified with any reasonable degree of certainty," and contributing the degree of the claimant's limitations to his medical condition, as opposed to other factors, would be difficult given the "relatively weak medical evidence and other factors discussed in the decision." The ALJ stated that one would expect to see some indication of restrictions placed on claimant, considering his allegations of disabling pain, but that Dr. Ismail's treatment notes for this time period did not indicate that he placed any restrictions on the claimant. Noting the claimant's ability to perform regular functions such as preparing meals, doing household chores, and paying bills, the ALJ found that the claimant's daily activities suggested he was not disabled.

Finally, the ALJ discounted the opinions of the medical professionals who examined the claimant. First, the ALJ gave little weight to the assessments of the State Agency medical consultant and disability examiner, because they did not examine or treat the claimant or have an opportunity to review the medical evidence submitted at the hearing level.

The ALJ gave "some weight" to the April 2012 physical assessment by the claimant's treating physician, Dr. Ismail, because his assessment was consistent with the claimant's history of treatment. However, the ALJ pointed out that, although the claimant complained of pain in multiple areas, he was not seeing any other physicians or taking any other pain medication at the time of the assessment. The ALJ gave "little weight" to Dr. Ismail's March 2013 assessments of the claimant's physical and mental limitations and allegations of pain. The ALJ found that, even though Dr. Ismail was a treating physician, his assessments were inconsistent with his own treatment records. The ALJ found the record to be inconsistent because in his assessment Dr. Ismail reported that the claimant had significant limitations but the record contained no mention or evidence of these limitations.   (R. 32).

After assessing the claimant's RFC, the ALJ found that the claimant was unable to perform his past relevant work as a dye machine operator because that job was medium in exertional level and semi-skilled. Noting the testimony of the vocational expert, the ALJ found that jobs existed in significant numbers in the national and regional economy that the claimant could perform, specifically, a bench assembler with 2,300 jobs in Alabama and 235,900 jobs nationally; an egg breaker with 16,300 jobs in Alabama and 420,000 nationally, and a small parts assembler with 2,250 jobs in Alabama and 235,000 nationally. (R. 34).

## VI. DISCUSSION

### I. The ALJ gave proper weight to the treating physician's opinion.

The claimant argues that the ALJ erred by failing to give proper weight to Dr. Ismail's opinion. The court disagrees and finds that substantial evidence existed to discredit Dr. Ismail's opinion.

18

The testimony of a treating physician must be given substantial or considerable weight unless "good cause" is shown to the contrary. *Crawford v. Commissioner*, 363 F.3d 1155, 1159 (11th Cir. 2004); *see also Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997). However, a treating physician's report may be discounted when it is not accompanied by objective medical evidence, is wholly conclusory, or is contradicted by other medical evidence in the record. *Crawford*, 363 F.3d at 1159. Where the ALJ articulated specific reasons for failing to give the opinion of a treating physician controlling weight and those reasons are supported by substantial evidence, she commits no reversible error. *Moore v. Barnhart*, 405 F.3d 1208, 1212 (11th Cir. 2005).

The ALJ articulated specific reasons for failing to give the opinion of Dr. Ismail controlling weight. The ALJ stated that she gave Dr. Ismail's March 2013 assessment "little weight" because it was inconsistent with the doctor's own treatment record. When discussing Dr. Ismail's treatment notes, the ALJ noted that, from April 30, 2012 through October 3, 2012, Dr. Ismail treated the claimant for a variety of complaints. The ALJ stated that one would expect to see some indication of restrictions placed on the claimant, considering his allegations of disabling pain, but that Dr. Ismail's treatment notes for this time period did not indicate that he placed any restrictions on the claimant. The ALJ also considered that, at a routine follow-up visit on August 6, 2012, the claimant denied having any complaints of pain. The ALJ mentioned that, at another appointment with Dr. Ismail on October 3, 2012, the claimant again denied any complaints of pain. Finally, the ALJ noted that, at the time of Dr. Ismail's April 2012 assessment, the claimant was not receiving medical attention or taking medication for any of his alleged physical impairments. (R. 29- 33).

19

Based on the explicit reasoning of the ALJ, this court finds that the ALJ applied the proper legal standard when discrediting Dr. Ismail's testimony and that substantial evidence supports her finding.

**II. The ALJ's RFC assessment is supported by substantial evidence in the record.**

The claimant argues that the ALJ's RFC assessment was incorrect where the ALJ found the claimant was capable of performing jobs at an exertional level of "less than light work." The claimant claims that a "sedentary" exertional level would be more appropriate.  However, this court finds that ALJ did not err because substantial evidence supports her RFC assessment.

When determining the claimant's functional limitation, the ALJ must consider all of the relevant evidence, including medical records and reports of daily activities. SSR 96–8p. Sedentary work involves lifting a maximum of ten pounds; occasionally carrying light items; and occasionally walking and standing. 20 C.F.R. § 404.1567(a), [20 C.F.R. § 416.967(a)] Light work involves lifting a maximum of twenty pounds; carrying ten pounds often; a good deal of walking; or sitting while operating arm and leg controls. 20 C.F.R. § 404.1567(b), [20 C.F.R. §416.967(b)].

The ALJ relied on the medical records when making the RFC assessment. The ALJ said that the weak medical evidence made it difficult to verify the limitations that the claimant reported. In supporting this opinion, the ALJ noted that the treatment for the claimant's back pain was conservative. The ALJ pointed out that the claimant reported only moderate back pain to his doctors and said that medication treated his back pain effectively. The ALJ also stated that, besides a mildly decreased range of motion in his lumbar spine, the claimant's range of motion,

strength, and gait were all normal. The ALJ pointed out that no evidence in the record suggests that the claimant's doctors placed any restrictions on the claimant. Based on the medical evidence, the ALJ did not find support that the claimant was limited to a sedentary exertional level.

The ALJ found that the claimant's self report of his physical abilities indicated that he was able to do work at a light exertional level. The ALJ noted that the claimant said he is able to do housework; cook; take care of his dog; drive; and go to the store without assistance. Because the claimant's physical abilities did not limit his daily activities, the ALJ did not find evidence to suggest the claimant was unable to complete work at a light exertional level.

Regarding the claimant's mental health, the ALJ noted the claimant's self assessment that he was able to groom and care for himself; remember to take his medication; and pay his bills. The ALJ pointed out that the claimant reported regularly spending time with others and talking about current events. The ALJ noted the claimant's testimony that he did not have any problems getting along with neighbors, family, friends, or others. Based on this self report, the ALJ found that the claimant's mental health did limit his work abilities but did not preclude him from work entirely because he is able to care for himself and interact with other people. (R. 32-33).

The ALJ properly applied the law in making her RFC assessment. The ALJ is required to consider all of the relevant evidence. SSR 96–8p. In reaching her conclusion, the ALJ considered the medical evidence in the treatment records; the claimant's self assessment of his daily activities; the claimant's testimony; and the treating physician's opinion. Ultimately the ALJ discredited the treating physician's testimony, but, as the court explained above, this decision

was substantially supported by the record. Therefore, the ALJ did consider all of the relevant evidence. By considering all of the evidence, the ALJ properly applied the law.

The claimant argues that the ALJ should have found the claimant to be limited to a sedentary work level and that, if he was, the MVR guidelines would direct a finding of disabled. But, this court has affirmed the ALJ's RFC assessment. Based on the ALJ's assessment, the MVR guidelines did not direct a finding. When the MVR does not direct a finding, the ALJ can rely on the Vocational Expert's testimony, which the ALJ did in this case. *See* S.S.R. 83-12. Based on the Vocational Expert's testimony, the ALJ found that the claimant is able to perform jobs which exist in significant numbers in the regional economy. Therefore, substantial evidence supported the ALJ's finding that the claimant was not disabled.

## VII. CONCLUSION

For the reasons as stated, this court concludes that the decision of the Commissioner is supported by substantial evidence and is to be AFFIRMED.

A separate order will be entered in accordance with this Memorandum Opinion.

DONE and ORDERED this 17th day of February, 2015.


KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE